# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

UNITED STATES OF AMERICA and     )
THE PEOPLE OF THE VIRGIN ISLANDS   )
                                         )
    v.                                  )
                                       )     **Criminal Action No. 2018-0009**
WADE CLARK,                    )
                                       )
             Defendant.      )
_____)

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Kia D. Sears, Esq.,**
St. Thomas, U.S.V.I.
    *For Defendant*

## <u>MEMORANDUM OPINION</u>

THIS MATTER comes before the Court on Defendant Wade Clark's ("Defendant" or "Clark") "Motion to Suppress Evidence and Statements" ("Motion to Suppress") (Dkt. No. 24); the Government's Opposition thereto (Dkt. No. 27); the parties' arguments made at the suppression hearing; Defendant's Supplemental Memorandum (Dkt. No. 48); the Government's Supplemental Opposition thereto (Dkt. No. 50); and Defendant's Reply (Dkt. No. 51).

For the reasons discussed below, the Court will grant in part and deny in part Defendant's Motion to Suppress. Specifically, the Court will deny Defendant's Motion as it relates to the two marijuana plants found in front of his residence and the statement Defendant made asserting that the plants were his and were for his personal use. However, the Court will grant Defendant's Motion as it relates to the statement he made pertaining to possession of marijuana after the officers entered his home and all other evidence found as a result of the search of his property.

# I.  BACKGROUND AND EVIDENCE

On April 4, 2018, Clark was charged with the following counts in an Amended Information: (1) Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) Possession of a Firearm with an Obliterated Serial Number, in violation of 18 U.S.C. §§ 922(k) and 923(a)(1)(B); (3) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); (4) Possession with Intent to Distribute (Marijuana Plants), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); (5) Possession with Intent to Distribute (Marijuana), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); (6) Unauthorized Possession of a Firearm, in violation of 14 V.I.C. § 2253(a); and (7) Unauthorized Possession of Ammunition, in violation of 14 V.I.C. § 2256(a). (Dkt. No. 6).[1]

Clark filed a Motion seeking to suppress all evidence obtained and statements made during a search of his home on February 27, 2018. During the subsequent suppression hearing, the Government presented the testimony of three witnesses: Leonardo Carrion, Director of Bureau of Investigations ("Dir. Carrion") for the Virgin Islands Department of Justice ("VIDOJ"); Bradley Bolen, Senior Inspector for the U.S. Marshals Service ("Insp. Bolen"); and Detective Jonathan Sanderson ("Det. Sanderson") of the Virgin Islands Police Department ("VIPD"). Defendant presented two witnesses: Kevin Augustin, an Investigator for VIDOJ ("Investigator Augustin"), and Brian Warner, an Investigator for the Office of the Federal Public Defender ("Investigator Warner"). The following evidence emerged from the testimony of the various witnesses.[2]

---

[1] Prior to the Amended Information, the Government initiated this action against Clark by filing an Information on March 29, 2018. (Dkt. No. 1).

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Clark is presumed innocent until proven guilty. Most of the

On February 27, 2018, VIPD officers, agents from VIDOJ—including officers from the Sex Offender Registration and Notification Act (SORNA) Unit—and deputies from the U.S. Marshals Service participated in "Operation Ponderosa" on St. Croix. "Operation Ponderosa" is an annual joint operation by law enforcement to conduct compliance checks of registered sex offenders residing in the Territory. During the compliance check, law enforcement visits each registered sex offender at his or her reported address to verify that the latter has provided accurate information and resides at the given address. The offender's contact information and vehicular registrations are also verified. The compliance check does not authorize law enforcement to enter the home of the individual involved.

Defendant Clark is a registered sex offender. On February 27, 2018, at approximately 10:30 a.m., the law enforcement personnel conducting "Operation Ponderosa" arrived at Clark's property located on a hill at 73 Mountpellier, Fredriksted. The driveway—which wrapped around to the left leading to the residence—spanned from the residence atop the hill to a gate at the bottom of the hill. The distance between the gate and the residence was less than a quarter of a mile. The residence is a concrete structure with two levels. The bottom level consisted of a studio apartment where Clark lived. The upper level was accessible only via stairs located behind the building.

The law enforcement team arrived in approximately four vehicles and parked at the bottom of the hill.[3] They wore tactical vests and, with the exception of the SORNA Unit, were all armed. The officers exited their vehicles and were walking toward the residence when Clark was seen walking down the driveway toward them. Officers from the U.S. Marshals and the VIPD—

---

facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[3] Dir. Carrion estimated that the team consisted of approximately eight or nine law enforcement officers, while Insp. Bolen placed the number at 12 to 14 officers.

including Insp. Bolen and Det. Sanderson—walked up the hill to create a perimeter around the property, and they were followed by the SORNA Unit which was responsible for conducting the compliance check with Clark.[4] About four to six officers—comprised of the SORNA Unit and other law enforcement personnel—approached Clark and he was informed that the team needed to see his residence.

As Dir. Carrion walked up the hill, he noticed two or three surveillance cameras mounted on trees facing the driveway. He also noticed what appeared to be two mature marijuana plants— about three to four feet tall—located a couple of feet in front of the door of Clark's residence. While on Clark's property, Dir. Carrion and other officers also observed suspicious activity around the property, which in Dir. Carrion's experience was indicative of marijuana cultivation. These observations included: windows covered with dark plastic bags, one of which had a ventilation system coming out of it; cameras throughout the property; an air condition unit running in the background; and the scent of marijuana permeating the air.[5] Det. Sanderson, who was standing at the back of Clark's residence, overheard Dir. Carrion say, "we have a problem here." Det. Sanderson walked around to the front of the residence and saw the two marijuana plants outside Clark's front door. He also observed Clark surrounded by four to five officers.

Suspecting marijuana cultivation on the property, Dir. Carrion approached Clark, who had

---

[4]   Insp. Bolen testified that because some members of the SORNA Unit are not armed law enforcement officers, a perimeter team—made up of armed officers—goes in first to ensure the group's safety.

[5] While Investigator Augustin observed that several windows were blacked out by bags, he stated that he did not smell marijuana. He also testified that he saw the marijuana plants by Clark's door when Dir. Carrion pointed them out to him. Investigator Warner, who interviewed Dr. Carrion regarding the events that occurred during Clark's arrest, testified that Dir. Carrion reported that he did not smell either burnt or cultivated marijuana at Clark's property.

been interviewed by the SORNA Unit.[6] Dir. Carrion asked Clark about the two marijuana plants and whether he was aware that they were there. Clark stated that the plants were his and that they were for his personal use. Dir. Carrion asked Clark if anyone else was living with him. Clark said he lived there alone, but that his girlfriend was with him at the time. Out of what he asserted was concern for the welfare of Clark's girlfriend, Dir. Carrion asked Clark if he could "check the residence to make sure that what [Clark] was telling [him] was correct." Clark declined the request, saying, "I would prefer that you not intrude my privacy." Dir. Carrion recalled getting a phone call at that moment, which he answered as he walked back down the driveway.

After Dir. Carrion left, Insp. Bolen asked Clark if they could look inside his house, and Clark said "no." Det. Sanderson observed Clark speaking with Insp. Bolen and he joined them. He testified that he overheard Insp. Bolen ask Clark if they could look inside his residence and Clark declined, saying, "it's my personal space." Det. Sanderson then asked Clark, "if you don't have anything to hide, then why do you mind us looking inside?"[7] Again, Clark declined, saying, "it's my personal space." Det. Sanderson testified that he told Clark, "I see you have marijuana out here," and then explained the local laws concerning possession of marijuana, stating that if Clark had under one ounce of marijuana, it garners him a citation, but that if it was over an ounce, "then we deal with that how you have to deal with that." According to Det. Sanderson, Clark replied,

---

[6] Investigator Augustin stated that Clark completed the compliance form in approximately five minutes. After Clark completed the form, Investigator Augustin went back down the hill as there was nothing else required of Clark with regard to the compliance check.

[7] Det. Sanderson testified that while he and Insp. Bolen were speaking with Clark, at least two Deputy U.S. Marshals were nearby. Det. Sanderson also testified that by the time he spoke with Clark, the team had been on Clark's property for approximately 15-20 minutes.

"well, I'll let you guys look inside my residence," and he walked toward the door and opened it.[8]

Both Insp. Bolen and Det. Sanderson testified that as soon as Clark opened the door, a strong smell of marijuana was apparent. According to Insp. Bolen, Det. Sanderson said he could smell marijuana and asked Clark if he had marijuana inside the apartment. However, Det. Sanderson testified that, upon smelling the marijuana, he once again explained to Clark what the local marijuana laws were in the Virgin Islands. Both officers testified that Clark stated that he had "approximately a quarter ounce of marijuana." Det. Sanderson asked Clark to show him the marijuana and Clark said it was in his backpack. Clark then walked inside his residence and Det. Sanderson and Insp. Bolen followed him.[9]

Clark walked over to a backpack on the bed located by the entrance, and pulled out a plastic bag full of dried marijuana. After seeing the quantity of marijuana in the bag, Det. Sanderson said he told Clark that his marijuana was well over an ounce, and placed Clark under arrest for possession of marijuana. Det. Sanderson escorted Clark out of the residence and instructed the Deputy U.S. Marshals—which included Insp. Bolen—to clear the residence.[10] Det. Sanderson then

---

[8] Det. Sanderson also testified that when Clark permitted the officers to look inside his residence, he specifically limited his permission only to him and Insp. Bolen by saying "just you two." On cross-examination, Det. Sanderson acknowledged that in his probable cause sheet and the affidavit supporting the Complaint, he described Clark as saying that Det. Sanderson "could look into" his residence, not that he "could look inside" his residence.

[9] Det. Sanderson testified that he followed behind Clark when the latter walked inside the residence for safety reasons, because he did not know "what [Clark was] going inside to retrieve." Det. Sanderson stated that, at this point in their encounter, he did not consider Clark to be in custody since he had neither physically touched Clark nor put him on any restraints. Det. Sanderson further testified that throughout their encounter, his tone with Clark was conversational and he did not threaten him. Det. Sanderson also confirmed that, while both he and Insp. Bolen wore tactical gear and were both armed, their guns were holstered.

[10] Insp. Bolen, along with a few other officers, cleared the entire floor to make sure no one else was inside. After clearing the premises, Insp. Bolen reported that the forensics unit arrived to process the scene.

*Mirandized* Clark, and, after placing him in handcuffs, escorted Clark down the driveway.

Meanwhile, Dir. Carrion—who at this point was down the driveway and had finished his earlier phone call—telephoned his office to seek legal advice in light of his observations of Clark's property and his suspicion of marijuana cultivation. As he was on the phone, Dir. Carrion reported seeing Clark, in handcuffs, being escorted down the driveway. Dir. Carrion ended his phone call and walked back up toward the residence, where he saw officers inside Clark's apartment conducting a search. This prompted him to ask, "how did we gain access to [Clark's] residence?" Det. Sanderson told him that Clark "had given permission for two members of the team to look into the apartment." Dir. Carrion went inside and testified that there was a strong odor of marijuana inside the apartment. He saw a number of plastic bags, in varying sizes, lying around the apartment that contained a leafy substance which appeared to be marijuana. Dir. Carrion also saw two open bags on top of Clark's bed—in one bag, he saw a number of plastic bags containing a green leafy substance; in the other bag, he saw a firearm at the bottom of the bag.[11] In a back room, down a short hallway, Dir. Carrion saw marijuana plants.[12]

After the lower level was cleared, Det. Sanderson and the Deputy U.S. Marshals went to the upper level to sweep it based on information obtained from DEA. They found what appeared to be an old grow set-up, with several dead marijuana plants. However, in one of the back rooms,

---

[11] Investigator Warner testified that when he asked Dir. Carrion how he discovered the firearm in the bag during his interview of him, Dir. Carrion "gestured with his hand as if he were holding a flashlight, as if he were looking into something, identifying something."

[12] Det. Sanderson testified that when he went to the back room, he observed 16 large marijuana plants and 446 smaller ones growing in pots. He also observed a lighting system and a ventilation system. Further, Det. Sanderson stated that several bags of packaged marijuana were found throughout the residence, concentrated in the bedroom/kitchen area. Det. Sanderson also said that contraband was located in "reusable shopping bags," "open[ed]" book bags, and plastic "see-through" Tupperware containers, and officers also found a scale in plain view.

officers found an additional 200 live marijuana plants.

## II.  DISCUSSION

Defendant seeks to suppress any evidence seized from his residence,[13] as well as any statements he made to law enforcement, as violative of his rights under the Fourth and Fifth Amendments. (Dkt. No. 24 at 1).[14]

The Government argues that no such violations occurred. It maintains that Defendant's initial encounter with law enforcement was consensual in order to complete the compliance check; that the officers' continued presence on Clark's property after the compliance check was completed was a valid *Terry* stop; that the physical evidence seized was obtained as a result of Clark's voluntary consent to enter his residence; and that Clark's statements were not made in response to a custodial interrogation necessitating *Miranda* warnings, and that they were, in fact, voluntary. (Dkt. No. 41 at 7; Dkt. No. 50 at 2-15). The Court will address each of these issues in turn.

As discussed below, the Court finds that Clark's initial encounter with law enforcement and the officers' continued presence on Clark's property after completion of the compliance check pass muster under the Constitution. The Court further finds that Clark's first statement, made to Dir. Carrion as it pertained to the marijuana plants found at his front door, did not necessitate *Miranda* warnings and was not violative of the Constitution. However, the Court finds that Clark's

---

[13]  This evidence, according to Defendant, includes, but is not limited to the following items: "the marijuana and the marijuana plants, the firearm and the ammunition, the scale, the grow lights system, the fertilizer, and the containers." (Dkt. No. 24 at 1).

[14]  In his Motion to Suppress, Defendant also seems to generally challenge "compliance checks" like "Operation Ponderosa" as unconstitutional. (Dkt. No. 48 at 1, 6). Because this argument was made only in passing, and not briefed or argued by the parties at the hearing, the Court deems it insufficiently presented to be addressed by the Court.

consent to enter his home was not voluntary and thus the subsequent search violated his constitutional rights, warranting suppression of the evidence found as a result of the search. Clark's second statement pertaining to his possession of marijuana, made after the officers entered his residence, is also subject to suppression as a consequence of the involuntary consent to enter Clark's residence.

### A. Seizure

Defendant argues that he was subject to an illegal seizure. (Dkt. No. 48 at 2-6). To determine whether Clark was illegally seized, the Court must consider: (1) whether a seizure of Defendant occurred when law enforcement initially encountered Clark on his property for purposes of a compliance check; and (2) whether the officers' continued presence on Clark's property after the compliance check was completed was legally permissible. The Court concludes that Clark's initial encounter with the officers was consensual and thus no seizure occurred, and that the officers' continued presence was permissible as it constituted a valid investigatory stop based on the officers' reasonable suspicion that Clark was involved in marijuana cultivation.

### 1. Clark's Initial Encounter With Law Enforcement

Clark asserts that he was seized as soon as the officers stopped him on his driveway. (Dkt. No. 48 at 2-4). He argues that this conclusion is warranted because of the officers' show of authority, as demonstrated by the number of officers present in tactical vests; the fact that officers established a perimeter around his house; and the reasonable belief that Clark—a sex offender—could not terminate the encounter because the officers were there to conduct a compliance check. (Dkt. Nos. 48 at 4; 51 at 2).

The Government counters that Clark was not seized because his initial encounter with the officers on the driveway was consensual, and the officers' conduct was limited only to approaching

Clark and asking him a few questions. (Dkt. No. 50 at 2-4).

### a.  Applicable Legal Principles

"Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy,* 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo,* 500 U.S. 565, 580 (1991)); *Estate of Smith v. Marasco*, 318 F.3d 497, 518 (3d Cir. 2003) ("[A] warrantless seizure in a person's home violates the Fourth Amendment[.]"). Evidence obtained as a result of an unreasonable search and seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 487–88 (1963).

A Fourth Amendment seizure analysis follows a two-step inquiry: (1) "determine whether a seizure took place, and if so, when the seizure occurred," *United States v. Mathurin*, 2015 WL 394015, at *4 (D.V.I. Jan. 29, 2015) (quoting *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014)); and (2) if a seizure in fact occurred, "was that seizure reasonable?" *United States v. De Castro*, 905 F.3d 676, 678 (3d Cir. 2018), *cert. denied,* 2019 WL 134428 (U.S. Feb. 19, 2019) (quoting *United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009)). The government must meet this burden by a preponderance of the evidence. *See United States v. Williams*, 400 F. Supp. 2d 673, 677 (D. Del. 2005) (citing *United States v. Matlock*, 415 U.S. 164, 177 (1974)).

"[P]olice conduct rises to the level of a 'seizure' when, 'by means of physical force or a show of authority, [a person's] freedom of movement is restrained.'" *De Castro*, 905 F.3d at 679 (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). Generally, this means that "'a seizure occurs when a reasonable person would believe that he or she is not free to leave.'" *United States v. Kim*, 27 F.3d 947, 951 (3d Cir. 1994) (quoting *Fla. v. Bostick*, 501 U.S. 429, 435 (1991) (internal quotations omitted)); *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) ("A seizure occurs

[w]henever an officer restrains the freedom of a person to walk away.") (internal citation and quotation marks omitted). However, the Supreme Court has clarified that in circumstances where an individual "is not free to simply walk away" because of "reasons unrelated to the police conduct at issue," the appropriate inquiry is instead "whether a reasonable person would feel free 'to disregard the police and go about his business' . . . or ultimately 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter' . . ." *Kim,* 27 F.3d at 951 (quoting *Bostick,* 501 U.S. at 434, 436). These latter circumstances apply here where Clark was on his own property when officers arrived and thus had no reason to leave. *Id.*

The Third Circuit has found that factors suggesting that a seizure may have occurred include: "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person [], or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *De Castro*, 905 F.3d at 679-680 (quoting *Mendenhall*, 446 U.S. at 554). Ultimately, the court must "take[] into account all of the circumstances surrounding the encounter." *Kim,* 27 F.3d at 951 (quoting *Bostick,* 501 U.S. at 436).

"[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (citation omitted). "Even if there is a show of authority [by officers], 'there is no seizure without actual submission.'" *United States v. Richardson,* 504 Fed. App'x 176, 181 (3d Cir. 2012) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). Actual submission "requires, at minimum, that a suspect manifest compliance with police orders." *United States v. Waterman*, 569 F.3d 144, 146 n.3 (3d Cir. 2009). However, a seizure does not occur "when an individual's submission to a show of governmental authority [reflects] passive acquiescence." *Brendlin*, 551

U.S. at 255. To effectuate a seizure, there must be something more than "inoffensive contact between a member of the public and the police . . ." *Mendenhall*, 446 U.S. at 555.

"'Not every interaction between a police officer and a citizen is protected by the Fourth Amendment.'" *De Castro*, 905 F.3d at 678 (quoting *Smith*, 575 F.3d at 312). For example, it is well-established that a Fourth Amendment "'seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Bostick*, 501 U.S. at 434). Such an encounter, that is short in duration, is characterized as "consensual" and does not amount to a Fourth Amendment seizure because "the citizen has the ability to engage in or terminate the encounter." *Crandell*, 554 F.3d at 84 (citing *United States v. Wilson*, 413 F.3d 382, 386–87 (3d Cir. 2005)); *see also United States v. Nichols*, 2015 WL 13344676, at *3 (E.D. Pa. Oct. 8, 2015) ("[A] mere approach by law enforcement officers that a reasonable person would feel free to rebuke does not constitute a seizure.") (citing *Florida v. Royer*, 460 U.S. 491, 497 (1980)).

The second step of the seizure analysis, i.e., whether a seizure that occurred was reasonable, "'depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" *United States v. Ubiles*, 224 F.3d 213, 216 (3d Cir. 2000), *as amended* (Sept. 28, 2000) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)). An objective inquiry is used to determine whether a seizure is a reasonable one, based on the totality of the circumstances, and considered "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klem*, 298 F.3d at 279 (internal citation and quotation marks omitted).

**b.    Analysis**

As noted above, any inquiry into an alleged seizure must begin by determining when the

seizure occurred. *Smith*, 575 F.3d at 313. With regard to Clark's initial encounter with the police officers, the record shows that Clark walked down to meet the officers who were coming up his driveway, walked back up with them to his residence, and completed the compliance check with the SORNA Unit. Under the circumstances here, the Court concludes that Clark demonstrated nothing more than "passive acquiescence" when he accompanied the officers back up to his residence to complete the compliance form with Investigator Augustin. *Brendlin,* 551 U.S. at 255 Further, prior to Clark's arrest, there is no evidence that Clark was touched or restrained in any way, *United States v. Wesselhoft*, 2016 WL 3212483, at *10 (D.V.I. Apr. 8, 2016), nor was there any evidence that anything other than a normal tone of voice was used when officers were speaking with Clark. *Id*.; *see also Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018) (finding no seizure where "[t]here is no allegation that [the officer] made intimidating remarks to [defendant] or announced his presence in a threatening fashion"). In addition, the testimony at the hearing established that the compliance form took only about five minutes to complete. Thus, the time from when Clark encountered the officers to his completion of the compliance check was relatively brief. Accordingly, the Court does not find that a seizure of Clark occurred here.

While the Court recognizes that Clark's status as a registered sex offender may have contributed to a reluctance on his part to terminate his encounter with law enforcement, this is not relevant to the seizure analysis because "the 'reasonable person' test presupposes an *innocent person*." *Kim*, 27 F.3d at 953 (quoting *Bostick,* 501 U.S. at 438). As the Third Circuit has stated, "[w]e do not believe an innocent person would feel compelled to cooperate with police by some potentially incriminating questions." *Kim*, 27 F.3d at 953. Further, the fact that law enforcement wore tactical gear and were armed also does not establish that a seizure occurred. As the Supreme Court has explained, whether an officer is in uniform and visibly armed has "little weight in the

[seizure] analysis" because "[o]fficers are often required to wear uniforms and in many circumstances this is a cause for assurance, not discomfort." *United States v. Drayton,* 536 U.S. 194, 204 (2002). The same reasoning applies to firearms: "That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." *Id.* at 205. In this case, there is no evidence that officers brandished their weapons against Clark. To the contrary, Det. Sanderson testified that, throughout the encounter with Clark, their guns were holstered. *Kim*, 27 F.3d at 951; *Mathurin*, 2015 WL 394015 at *6.

Further, while the Court finds—contrary to the Government's portrayal (Dkt. No. 50 at 2-3)—that from the moment Clark encountered officers on his driveway, he was in fact surrounded by law enforcement as a result of the officers walking toward Clark and those establishing a perimeter around his property, such conduct alone is not sufficient to constitute a seizure. At the scene of an investigation, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Brendlin*, 551 U.S. at 258 (internal citation and quotation marks omitted). Without more, no seizure occurred. *Cf. United States v. Lowe*, 791 F.3d 424, 431–32 (3d Cir. 2015) (finding that a seizure occurred in circumstances where "three marked police vehicles nearly simultaneously arrived at [defendant's location] at four o'clock in the morning[,] [f]our uniformed police officers immediately got out of their patrol cars and approached [defendant and his companion], commanding them to show their hands . . . [the officers] arrived in a hurried manner and at least one officer drew his firearm at some point during the encounter.") (emphasis deleted); *United States v. Fautz*, 812 F. Supp. 2d 570, 609 (D.N.J. 2011) (concluding that "when defendant opened his door to the officers who were knocking on it, and the SERT team led the officers in with weapons drawn and surrounded him

while he stood there in submission, a seizure of his person occurred within the meaning of the Fourth Amendment").

In view of the foregoing, the Court finds that the officers' initial approach of Clark did not constitute a seizure. Instead, the initial encounter under the circumstances was consensual, Clark demonstrated nothing more than "passive acquiescence," and thus Clark's Fourth Amendment rights at this juncture were not implicated.[15]

### 2. Marijuana Plants In Front of Clark's Residence

Because the Court has found that Clark's initial encounter with law enforcement did not constitute a seizure, such a finding necessitates a determination as to whether any evidence observed by the officers while they were standing outside Clark's residence during the compliance check should be suppressed. The Court finds that this inquiry is limited to the two marijuana plants which Dir. Carrion observed in front of Clark's residence.

The testimony at the hearing established that at least one of the officers at the scene, Dir. Carrion, saw the marijuana plants located directly in front of Clark's door while Clark was being interviewed by the SORNA Unit to complete the compliance check. Thus, because Clark's initial encounter with the officers did not constitute a seizure—let alone an illegal seizure—the marijuana plants that were observed in plain view during this initial encounter cannot be deemed "fruit of the poisonous tree." *Cf. United States v. Mosley*, 454 F. 3d 249, 269 (3d Cir. 2006) (finding that because defendant was illegally seized, the guns found which directly resulted from his seizure were fruit of the poisonous tree and must be suppressed). The marijuana plants in front of Clark's

---

[15] Even if the initial encounter with Clark had constituted a seizure, such seizure would have been reasonable in view of the fact that it was limited in both scope and duration. *Illinois v. McArthur*, 531 U.S. 326, 331-33 (2001). Officers formed a perimeter around Clark's property, others approached him as he walked down the driveway and walked back up the driveway with him, and Clark completed the compliance form in approximately five minutes.

door will not, therefore, be suppressed.

### 3. The Officers' Continued Presence On Clark's Property

Having determined that Clark was not seized during his initial encounter with law enforcement, the Court turns next to whether the officers' continued presence on the property after the compliance check was completed was permissible. The Court finds in the affirmative as the officers' continued presence constituted a legitimate investigative purpose, based on their reasonable suspicion that Clark was operating a marijuana grow on the property.

#### a. Applicable Legal Principles

It is well-established that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30 (1968)).[16] As the Third Circuit stated in *U.S. v. Valentine,* 232 F.3d 350, 353 (3d Cir. 2000):

> Reasonable suspicion is 'a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . .' The question we must address is whether [the police officers] had the 'minimal level of objective justification' necessary for a *Terry* stop. And in evaluating reasonable suspicion, 'we must consider the totality of the circumstances—the whole picture.'

*Id.* at 353 (internal citations and quotation marks omitted). To make a showing of reasonable suspicion, "'[t]he officer must be able to articulate more than an 'inchoate and unparticularized

---

[16] "There is no question that a Terry stop constitutes a seizure," *United States v. Ford*, 2010 WL 2305868, at *3 n.2 (D.V.I. June 4, 2010) (citing *United States v. Edwards,* 53 F.3d 616, 620 (3d Cir. 1995) ("Clearly, a Terry stop is a seizure . . . and one seized is by definition not free to leave.")). However, it is deemed a legally permissible warrantless seizure as long as "the intrusiveness of the stop [does not] exceed[] the level of suspicion supporting the stop." *Ford*, 2010 WL 2305868 at *3 n.2 (citing *Edwards,* 53 F.3d at 619 ("Under the Terry cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect.") (internal citation and quotation marks omitted)).

suspicion or 'hunch' of criminal activity.'" *Ubiles*, 224 F.3d at 217 (quoting *Terry*, 392 U.S. at 27). Thus, "[t]he conduct of a so-called *Terry* stop must be justified by the information known to the officer at the initiation of the stop and must be limited in scope by the circumstances that justified the interference in the first place." *Nichols*, 2015 WL 13344676 at *4 (citing *Royer*, 460 U.S. at 500). "Ultimately, it is the government's burden to demonstrate that any detention or seizure justified on the basis of reasonable suspicion was sufficiently limited in scope and manner to satisfy the conditions of an investigative stop." *United States v. McGrath*, 89 F. Supp. 2d 569, 577 (E.D. Pa. 2000) (citing *Royer*, 460 U.S. at 500). If an officer conducts a *Terry* stop without the requisite reasonable suspicion, any evidence recovered is "fruit of the poisonous tree" and must be suppressed. *Wong Sun,* 371 U.S. at 488; *see United States v. Brown,* 448 F.3d 239, 244 (3d Cir. 2006).

Finally, unintrusive investigative stops, like *Terry* stops, may take place at a residence. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981) ("the [Fourth Amendment] exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry . . .*"); *see also United States v. Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007) (finding that a *Terry* stop can occur at a person's own residence, as long as seizure occurs outside the home and not inside the residence); *United States v. Denson*, 2006 WL 3144857, at *2-5 (W.D. Pa. Oct. 31, 2006) (finding valid a *Terry* stop of defendant which occurred in another individual's residence who allowed officers inside).

### b.    Analysis

The Court finds that the officers' continued presence on Clark's property constituted a *Terry* investigatory stop which permitted them to legitimately remain on the property after the

compliance check was completed as the officers had at least reasonable suspicion, based on their observations of the property, of criminal activity. Specifically, at the hearing, the officers testified to various observations they made of Clark's property which allowed them to "articulate more than an 'inchoate and unparticularized suspicion or hunch'" that Clark was operating a marijuana grow on the premises. *Ubiles*, 224 F.3d at 217 (quoting *Terry*, 392 U.S. at 27). These observations include: the two mature marijuana plants located in plain view in front of Clark's residence; the surveillance cameras; the fact that most, if not all, of the windows on Defendant's property were blacked-out by plastic bags; the sound of an air conditioner running; the fact that a ventilation system was coming out from one window; and the smell of marijuana that permeated the air. These facts, taken together, support the conclusion that law enforcement had at least the requisite reasonable suspicion to "stop," i.e., seize, Clark for investigative purposes.

Because the Court finds that the officers' continued presence on the premises was permissible based on their reasonable suspicion that Clark was involved in a marijuana grow operation, their continued presence on the property, notwithstanding Clark's completion of the compliance check, did not violate Defendant's Fourth Amendment rights.

### B.      Search

The next issue before the Court is whether the search of Clark's property passes muster under the Fourth Amendment so as to render the remaining physical evidence immune from a constitutional challenge.

Clark argues that he did not consent for officers to enter his home. (Dkt. No. 48 at 8).[17]

---

[17]   Clark further argues that Det. Sanderson's testimony regarding whether Clark permitted him and Insp. Bolen to enter his residence is not credible. *Id*. at 8. Due to the Court's finding, discussed below, that Clark's purported consent was not voluntary, the Court need not resolve the credibility issue presented here. Clark also argued that if there was consent, it was "tainted" by his prior "illegal seizure." *Id*. at 9. The Court finds this argument unavailing because the Court has already

Alternatively, Clark argues that even if the Court concludes that he gave consent, his consent was involuntary as the officers' conduct resulted in his "will [being] overborne." (Dkt. No. 48 at 10). In contrast, the Government argues that Clark granted the officers implied consent to enter his residence (Dkt. No. 50 at 10-11), and that, under the totality of the circumstances, Clark's consent was voluntary. *Id*. at 9.

### 1.    Applicable Legal Principles

The Supreme Court has long established that "the search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment." *Matlock,* 415 U.S. at 165–66. When an individual gives valid consent to a search of his property, "any evidence discovered during such a search may be seized and admitted at trial." *Kim,* 27 F.3d at 955. However, "under the exclusionary rule, 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" *United States v. Clark*, 234 F. Supp. 2d 471, 474 (D.N.J. 2002) (quoting *United States v. Calandra,* 414 U.S. 338, 347 (1974));  *see also United States v. Rose*, 189 F. Supp. 3d 528, 544 (D.V.I. 2016) ("[E]vidence obtained following a violation of a defendant's constitutional rights will be suppressed as 'fruit of the poisonous tree.'") (quoting *Mosley*, 454 at 269).

To justify a warrantless search based on consent, the Government has the burden to prove—by a preponderance of the evidence—that the consent was "freely and voluntarily given." *United States v. Price,* 558 F.3d 270, 277 (3d Cir. 2009) (quoting *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968) (internal quotation marks omitted)); *see also Matlock,* 415 U.S. at 177; *United States v. Velasquez,* 885 F.2d 1076, 1081 (3d Cir. 1989)). The determination of whether a

---

determined that Clark was not seized during his initial encounter with law enforcement and that he was, subsequently, validly seized during a legitimate *Terry* stop.

consent to search was made voluntarily is based on analyzing the "totality of the circumstances, including the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment.'" *Price*, 558 F.3d at 278; *see also United States v. Ortiz*, 483 F. App'x 712, 716 (3d Cir. 2012) (same). "[T]he setting in which the consent was obtained and the parties' verbal and non-verbal actions" are also relevant considerations in determining the voluntariness of the consent. *Price*, 558 F.3d at 278. Accordingly, "[b]oth 'the characteristics of the accused and the details of the interrogation' are useful to determine whether, under all the circumstances, a consent to search was voluntary, and no case should 'turn[ ] on the presence or absence of a single controlling criterion.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). If a defendant freely and voluntary consents to a search, the search is lawful. *Kim,* 27 F.3d at 955.

### 2. Analysis

As a preliminary matter, whether consent to search was given by Clark under the circumstances here is an issue which the Court need not address, because even assuming that Clark provided such consent, the Court finds that the Government has not shown by a preponderance of the evidence that Clark's consent was voluntary. Instead, any consent by Defendant constituted mere acquiescence to the officers' repeated requests.

The Supreme Court in *Bumper* held that the government's "burden of proving that consent [to search] was, in fact, freely and voluntarily given . . . cannot be discharged by showing no more than acquiescence to a claim of lawful authority." 391 U.S. at 548–49. This principle is at the heart of the particular issue here: to what extent may an officer (or officers) repeatedly request consent to search in the face of an individual's repeated denials of such a request, before the consent crosses

the line from voluntary consent to mere acquiescence?

The Court notes at the outset that there is no bright-line rule that the Court can use to establish when a certain number of requests for consent to search by an officer or officers may turn coercive and erode the voluntary nature of an individual's consent. However, the Court has found that the facts in *United States v. Eberhart*,1998 WL 34113374, at *1-3 (N.D. Iowa Oct. 9, 1998) present an analogous situation and is therefore helpful to the Court's analysis.

In *Eberhart*, an officer was investigating a burglary in defendant's apartment complex. *Id.* at *1. When the officer knocked on defendant's door, he explained to the defendant the purpose of his investigation and that he wanted to speak with him. *Id.* As the defendant "stepped outside, squeezing through the door so that it would be opened as little as possible," the officer observed a stereo in his apartment and asked if he could inspect it. *Id.* The defendant denied the officer's request to come inside. *Id.* The officer observed that the defendant was shaking, and asked him if "he wanted to go inside, sit down, and talk about it," which the defendant declined, citing the fact that his girlfriend was sleeping inside. *Id.* After further exchange, the officer once again asked defendant if he could look at the stereo inside the apartment and defendant again said "no," specifically telling the officer that if he wanted to look at the stereo he could come back the next day with a warrant. *Id.* However, shortly thereafter, the officer confirmed that the defendant's girlfriend was not, in fact, with him at his apartment and the officer returned to the apartment. *Id.* At this point, the defendant told the officer to come into the apartment to inspect the stereo and held the door open for him as he stepped inside. *Id.* While inside, the officer found drug paraphernalia and firearms; he obtained a search warrant based on these observations; and he arrested defendant. *Id.* at *2.

In granting defendant's motion to suppress, the *Eberhart* court found that the defendant's consent to the search of his apartment was not voluntary. *Id*. at 4. The court, *inter alia*, pointed to the fact that defendant initially demonstrated an obvious reluctance to let the officer inside because when the officer first came to his door, defendant "acted in such a way as to try to limit [the officer's] observation of his apartment." *Id*. More importantly, the court cited the fact that defendant denied the officer's requests to go inside his apartment at least three times before telling the officer to come back the next day with a warrant. *Id*. The court noted that while it credited the officer's testimony that the encounter with defendant was "professional and polite, it was also clear from [the officer's] behavior that he did not want to take 'no' for an answer." *Id*. The court stated:

> The court's impression is that [the officer] kept asking for consent until the defendant's will was overborne. While the case law does not prohibit police from asking for a consent a second time, the question ultimately becomes how many times do you have to say "no" to a police officer before he can be expected to stop asking for consent to search your residence? Having been denied four times and specifically told to get a warrant, this court concludes that Deputy Chapman crossed the line and that the defendant's capitulation was not the product of free and voluntary consent.

*Id*.

Similarly here, the Court finds that the officers' repeated requests for Clark's consent to search his apartment in the face of his repeated declinations resulted in Clark's "capitulation [that] was not the product of free and voluntary consent." *Id*. The evidence reveals that after Clark completed the compliance check, the officers remained on his property to conduct an investigation into what they suspected was Clark's marijuana grow operation. During this time, the testimony at the hearing confirmed that three different officers—in quick succession spanning a matter of minutes—asked Clark to let them go inside and search his residence. First, Dir. Carrion informed Clark of the marijuana plants and asked him if he could enter his residence. Clark declined by saying, "I would prefer that you not intrude my privacy." Minutes later, in response to Insp.

Bolen's request, Clark said, "no . . . it's my personal space." Immediately after that, Det. Sanderson asked Clark, "if you don't have anything to hide, then why do you mind us looking inside?" For the third time, Clark declined, saying, "it's my personal space." Det. Sanderson then proceeded to inform Clark about the Territory's marijuana laws, seemingly suggesting that if Clark had less than an ounce, he would get only a citation. At that point, Clark allegedly stated that he would allow Det. Sanderson and Insp. Bolen to "look into" his residence; he opened the door; and he went inside his apartment.[18] Both officers followed him inside. This took place under circumstances where there was a team of approximately between 12 to 14 law enforcement personnel on Clark's property.

Clark's multiple denials of the officers' repeated requests for consent to search demonstrated that, like the defendant in *Eberhart*, he was not readily cooperative. His repeated denials reflected that he did not want the officers to enter and conduct a search of his home. However, as in *Eberhart*, the officers' insistent conduct in the face of Clark's obvious reluctance and hesitation—as manifested by his repeated denials—suggests that the officers were not going "to take no for an answer." *Eberhart*,1998 WL 34113374 at *4. Such conduct on the officers' part ultimately resulted in Clark's capitulation to the officers' requests. Such capitulation by Clark does not constitute voluntary consent. *See United States v. Gutierrez-Lopez*, 958 F.2d 379 n.1 (9th Cir. 1992) (affirming district court's grant of defendant's motion to suppress evidence and finding consent to search defendant's bag involuntary because the border patrol agents' conduct was "coercive, although not flagrantly so," where the agents asked defendant three times to search her

---

[18] Defendant argued that there was conflicting testimony as to whether Clark told Insp. Bolen and Det. Sanderson that they "could look inside" or that they "could look into" his apartment. However, the Court does not find the alleged conflict of any import in its analysis as to whether Defendant's consent to search was voluntary.

bag and she did not respond to their first two requests, but finally agreed to the search on the agents' third try); *United States v. Allen*, 349 F. Supp. 749, 752 (N.D. Cal. 1972) (suppressing evidence where the court found that defendant's consent was involuntary, in that although defendant "ultimately uttered words of assent to the request by the officers to open the bag, his acquiescence came only after repeated requests by the agents accompanied by references to the inevitability of a search by the local authorities"); *United States v. Ortega*, 2007 WL 3306612, at *2 (M.D. Fla. Nov. 6, 2007), *opinion adhered to on reconsideration,* 2007 WL 4247701 (M.D. Fla. Nov. 30, 2007) (granting defendant's motion to suppress because, *inter alia*, defendant's acquiescence to the officers' repeated requests for consent to search his residence did not constitute voluntary consent).

Other case law, while not directly on point, buttresses the Court's finding that any consent by Clark under the circumstances here was involuntary. In circumstances where law enforcement is attempting to obtain consent to search, courts have found that a lack of "repeated questioning" by the officers and the fact that defendant responds to such requests to search with ready cooperation, or without hesitation or reluctance, support a finding of voluntariness. *See Kim*, 27 F.3d at 955 (finding defendant's consent to search voluntary where "there was no repeated [] questioning" and defendant was "cooperative" and "readily consented to the search," his demeanor exhibited no signs of "hesitation," and defendant was "not at all reluctant" to permit the search); *see also United States v. Martinez*, 460 F. App'x 190, 194 (3d Cir. 2012) (finding defendant's consent to search voluntary where, *inter alia*, his encounter with the police "lack[ed] [] repeated questioning" and defendant gave an "immediate consent to the search"); *United States v. Mendoza*, 334 F. App'x 515, 517 (3d Cir. 2009) (finding consent to search voluntary where defendant was cooperative with officers from the outset of his encounter and defendant was not subjected to

"repeated questioning"); *Wesselhoft*, 2016 WL 3212483 at *10 (finding defendant's consent to search his home was voluntarily and freely given where defendant "was cooperative during [his] entire interaction" with officers). Further, courts have also condemned "badgering" behavior on the part of law enforcement authorities to obtain consent to search due to its coercive nature. *See United States v. Quintero*, 648 F.3d 660, 670-71 (8th Cir. 2011) (finding that the officers' conduct, which included "repeatedly badger[ing]" defendant's girlfriend for "several minutes" to search their hotel room resulted in an involuntary consent because the girlfriend's "will [was] overborne, and [her] capacity for self-determination critically impaired . . ."); and *U.S. v. Freeman*, 635 F. Supp. 2d 1205, 1212-1213 (D. Or. 2009) (finding defendant's consent involuntary because, *inter alia*, defendant told the federal agents who knocked on his door to leave at least three times and they refused and remained on defendant's property until they finally gained entrance).

No indication of Clark's ready cooperation was apparent here. Instead, Clark expressed an obvious unwillingness to consent to the search by denying the officers' request to search three separate times. Notwithstanding the absence of a hostile interaction between Clark and the officers, the officers' insistence—manifested by their repeated requests in the face of Clark's denials—resulted in Clark's eventual acquiescence, rather than a voluntary consent to the search. Based on the foregoing, the Court concludes that the Government has failed to meet its burden of demonstrating voluntary consent under the circumstances here.

In view of the foregoing, the search of Clark's residence and the upper level of the building was impermissible because it was grounded in an involuntary consent to search. Accordingly, the evidence derived from the officers' impermissible search, i.e., the firearm and ammunition, the processed marijuana, the scale, the grow lights system, the fertilizer, the containers, and the marijuana plants, are all "fruit of the poisonous tree" and will thus be suppressed. *Clark*, 234 F.

Supp. 2d at 474; *Rose*, 189 F. Supp. 3d at 544. Suppression of the evidence is appropriate here so as to deter future attempts by law enforcement to disregard a defendant's repeated refusal to consent to a search and to deter "abuses of the consent exception." *United States v. Parson*, 599 F. Supp. 2d 592, 609 (W.D. Pa. 2009); *see also United States v. Roberts*, 2012 WL 1033515, at *8 (E.D. Pa. Mar. 28, 2012) (suppressing evidence of a search because "the deterrence benefits of suppression outweigh the social costs[, thus] [a]s a result, we (and society) must swallow the 'bitter pill' of exclusion . . .") (internal citation omitted).[19]

### C. Defendant's Statements

The Court next considers whether Clark's statements to law enforcement should be suppressed. There are two statements at issue. (Dkt. No. 48 at 19). The first statement was made by Clark prior to the officers' entry into his home. As Clark completed his interview with the SORNA Unit, Dir. Carrion approached Clark and asked him whether he was aware of the marijuana plants in front of his residence and Clark stated that the plants were his and that they were for his personal use. The second statement was made when Clark opened the door to his residence, Det. Sanderson detected the smell of marijuana and repeated his explanation of the local laws regarding marijuana possession, and Clark stated that he had "approximately a quarter ounce of marijuana."

Clark argues several grounds to warrant suppression of his statements. First, Clark contends that these statements that he made to law enforcement should be suppressed as he was

---

[19] Because the Court finds that Clark's consent was involuntary and thus the resulting search was invalid under the Fourth Amendment, the Court need not address the parties' remaining issues pertaining to the applicability of the protective sweep exception to the warrant requirement. (Dkt. Nos. 48 at 12-19; 50 at 11-14; and 51 at 6-7). The invalidity of the search is sufficient to render the resulting evidence "fruit of the poisonous tree." *Wong Sun,* 371 U.S. at 487–88.

"in custody from the moment he encountered the 12-14 officers who announced they were there for a sex offender registry 'compliance check,'" and he therefore should have been provided *Miranda* warnings. (Dkt. No. 48 at 20; see also Dkt. No. 24 at 9-10). Clark also contends that his statements should be suppressed as fruits of his illegal seizure in violation of the Fourth Amendment. (Dkt. No. 24 at 7-8). Further, Clark argues that his statements were involuntary. (Dkt. No. 24 at 10-11; Dkt. No. 48at 20). Finally, specifically as it pertains to his second statement, Clark argues that "anything discovered after [Det. Sanderson] entered [his] residence must be suppressed as fruits of an unlawful search." (Dkt. No. 48 at 10).

The Government argues that Clark's statements do not warrant suppression because Clark was neither subject to an illegal seizure nor custody for the purposes of *Miranda* during his encounter with the officers. (Dkt. No. 41 at 5-6; Dkt. No. 50 at 3-4 and 14-15). Rather, according to the Government, Clark was detained under a *Terry* stop, which "does not constitute *Miranda* custody," and thus does not necessitate that the warnings be provided. (Dkt. No. 50 at 15). The Government also argues that Defendant's statements were voluntary. (Dkt. No. 41 at 7).

The Court finds that while there is no basis to suppress Defendant's first statement concerning the marijuana plants by his front door, Defendant's second statement claiming he had "approximately a quarter ounce of marijuana" is fruit of the involuntary consent to search Clark's residence and will thus be suppressed.

## 1.    Defendant's First Statement

### a)    Applicable Legal Principles

*Miranda v. Arizona*, 384 U.S. 436 (1966), held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege

against self-incrimination." *Id.* at 444. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion).

A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (quotations omitted). Additionally, "the relevant environment [must] present[ ] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 Fed. App'x. 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). "This determination is objective, based on 'how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 Fed. App'x. 223, 227 (3d Cir. 2003) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 Fed. App'x. 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

The Supreme Court has found that a defendant's Fifth Amendment rights are not implicated during a *Terry* stop because "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98 (2010); *see also United States v. Lewis*, 2008 WL 2625634, at *6 (D.V.I. July 2, 2008) (finding that since defendants were "initially detained pursuant to a lawful *Terry* stop . . . '[s]uch Terry-stops do not render a person in custody for purposes of *Miranda*.'") (quoting *United States v. Galberth,* 846 F.2d 983, 994 (5th Cir.1988) (citations omitted), *cert. denied,* 488 U.S. 865 (1988));

*Denson*, 2006 WL 3144857 at *3 ("*Miranda* warnings are not required, however, during a valid *Terry* stop.") (citing *Hiibel v. Sixth Judicial Dist. Court,* 542 U.S. 177, 184 (2004)). Thus, in the context of a *Terry* stop, the fact that the officers "failed to give antecedent *Miranda* warnings would not render their subsequent questions impermissible." *United States v. Bennett*, 2000 WL 1358480, at *8 (E.D. Pa. Sept. 20, 2000).

"However, this is not to say that every police encounter that begins as the usual traffic stop or investigatory detention will never become the 'type[ ] of situation[ ] in which the concerns that powered the [*Miranda*] decision are implicated.'" *United States v. Mcintosh*, 2017 WL 216697, at *9 (D.V.I. Jan. 17, 2017) (quoting *Shatzer*, 559 U.S. at 112-13 (quoting *Berkemer*, 468 U.S. at 437) (quotations omitted)). As the Supreme Court explained in *Berkemer*: "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." 468 U.S. at 440. Indeed, because the majority of circuits find that *Terry* stops may result in custody for *Miranda* purposes, it is appropriate for courts to examine how the particular investigative stop was conducted. *See Mcintosh*, 2017 WL 216697 at *9; *Denson* 2006 WL 3144857 at *4-5.[20]

---

[20] The Court notes that there is a circuit split on the issue of whether coercive, albeit reasonable, *Terry* stops can become custodial for purposes of *Miranda*. *Compare United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003) (finding that a suspect is not in custody when an investigative stop is reasonable); *United States v. Trueber*, 238 F.3d 79, 92-4 (1st Cir. 2001) (*Terry* stop of vehicle in which defendant was an occupant, where officer had his gun drawn when he asked the latter to step out of vehicle, did not amount to a custodial interrogation under *Miranda*); *and United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (finding that *Terry* stop cannot amount to custody, even where the officers are "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force . . ."), with *United States v. Newton*, 369 F.3d 659, 673-77 (2d Cir. 2004) (holding that a handcuffed suspect was in custody for *Miranda* purposes even though he was told that he was not under arrest, arguing that whether a detention is properly classified as a *Terry* stop is "irrelevant" to the *Miranda* analysis, and noting the split of authority on this issue)*, and United States v. Swanson*, 341 F.3d 524, 528

**b)** **Analysis**

With these legal principles in mind, the Court analyzes the totality of the circumstances surrounding Defendant's statement to Dir. Carrion that the marijuana plants by his front door were his and that they were for his personal use, and concludes that Clark—although subjected to a *Terry* stop at the time—was not in custody for purposes of *Miranda* when this statement was made.

As discussed above, the officers' continued presence on Clark's property after Clark had completed the compliance check subjected Clark to a permissible *Terry* investigative stop because the officers had at least reasonable suspicion, based on their observations of the property, of Clark's criminal activity. Thus, the issue to consider here is whether Clark's *Terry* stop constituted custody for purposes of *Miranda* so as to implicate Clark's Fifth Amendment rights.

The initial step in determining whether a person is in custody "is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (internal citations and quotation marks omitted) (brackets in original). The Third Circuit has identified several factors that courts should weigh in determining whether an individual is "in custody" during questioning for purposes of the *Miranda* analysis. These include:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

(6th Cir. 2003) ("[t]he very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights . . . Therefore, the pertinent question is whether [defendant] was 'in custody' during the investigatory detention for the purposes of determining whether his Fifth Amendment rights were violated."); *United States v. Kim*, 292 F.3d 969, 976-78 (9th Cir. 2002) (concluding that under the totality of the circumstances the suspect would not have felt free to leave, and therefore was in custody for Miranda purposes); *United States v. Perdue*, 8 F.3d 1455, 1463-66 (10th Cir. 1993) (positing that even a reasonable Terry stop can require Miranda warnings once the police use excessive, coercive force).

*United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006). Courts should also consider "the information known by the officer[s] concerning the suspect's culpability," *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (citing *Steigler*, 496 F.2d at 799), as "'[t]he more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda,* and vice versa.'" *Jacobs*, 431 F.3d at 105 (quoting *Steigler*, 496 F.2d at 799). Finally, courts should also take into account "whether the officer[s] revealed [their] belief that the suspect was guilty," as this factor may bear upon the custody issue if the officers convey such belief to the suspect "'by word or deed.'" *Jacobs*, 431 F.3d at 105 (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)).

As to the first factor, none of the officers told Clark he was under arrest or that he was not free to leave, which weighs against a finding of custody. *United States v. Harder*, 180 F. Supp. 3d 355, 363 (E.D. Pa. 2016) (finding that defendant was not in custody where "[n]o one told [d]efendant that he was under arrest or that he was not free to leave."); *see also Reinert v. Larkins*, 379 F.3d 76, 86-7 (3d Cir. 2004) (finding defendant was not in custody even though "he was never told that he was free to leave or free not to answer questions.").

Second, the fact that the encounter between the officers and Clark occurred on his property also weighs against a finding of custody. "When a person is questioned *on his own turf* . . . the surroundings are not indicative of the type of inherently coercive settings that normally accompanies custodial interrogation." *Willaman*, 437 F.3d at 360 (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)).

Third, the length of the exchange between Clark and the officers prior to Clark's arrest does not evince custody. The record shows that Clark was subjected to only two instances of questioning: the first by Dir. Carrion who asked him if he was aware of the marijuana plants by

his front door and the second consisting of the three officers' requests to consent to search—both exchanges lasting only a short time. "[T]he fact that an individual is briefly detained while asked a moderate number of questions does not, by itself, give rise to a custodial investigation." *Denson*, 2006 WL 3144857 at *3.

Fourth, the record also shows that the officers did not use hostile tones of voice with Clark. Moreover, the record also reveals that while the officers were armed and wore tactical gear, none of them brandished their weapons or physically or verbally threated Clark.

Finally, the Court recognizes that the officers had formed a suspicion that Defendant was involved in a marijuana grow based on their various observations of his property, and that Dir. Carrion specifically asked Defendant about the two marijuana plants by his front door. However, the brevity of the questioning and the absence of other indicia of coerciveness belie any suggestion of a "bear[ing] down in interrogation" by the officers that would "create [an] atmosphere of significant restraint" so as to trigger *Miranda*. *Jacobs*, 431 F.3d at 105. Indeed, knowledge of the suspect's culpability and the conveying of such knowledge to the suspect—without more—do not amount to a custodial situation for purposes of *Miranda*. *See Jacobs*, 431 F.3d at 107-8.

Because the Court finds that, under these circumstances, Clark was not subjected to restraints "to the degree associated with a formal arrest," *Leese*, 176 F.3d at 743, Clark—although subjected to a *Terry* stop at the time—was not in custody and his *Miranda* rights were not triggered. Therefore, the statement made by Clark claiming that the marijuana plants by his front door were his and that they were for his personal use will not be suppressed.[21]

---

[21] While the Court credits the fact that throughout Clark's encounter with law enforcement, there were 12-14 officers on his property, there is no showing in the record that the officers' presence effectively transformed the environment into one possessing "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*," so as find that Clark was in custody. *Arena*, 629 F. App'x at 457; *accord United States v. Kofsky*, 2007 WL 2480971, at *27

### 1. Defendant's Second Statement

#### a) Applicable Legal Principles & Analysis

Statements made as a result of an involuntary consent to search, i.e., an illegal search, are also considered fruit of the poisonous tree and are subject to suppression. *United States v. Johnson*, 2012 WL 5354601, at *9 (E.D. Pa. Oct. 31, 2012) (suppressing statements obtained after officers conducted an illegal search of Defendant's home); *United States v. Zamichieli*, 2011 WL 6133352, at *3 (E.D. Pa. Dec. 9, 2011) (suppressing all evidence obtained in connection with an illegal search of Defendant's vehicle, including the gun and any statements made by Defendant following the search, as fruit of the poisonous tree) (citing *Wong Sun,* 371 U.S. at 487–88); *United States v. Chun Yen Chiu*, 857 F. Supp. 363, 365 (D.N.J. 1993) ("Verbal evidence . . . which is derived directly or indirectly as the result of illegal conduct is no less subject to suppression than the more common tangible type of evidence."); *see also Eberhart*,1998 WL 34113374, at *5 (suppressing defendant's statements obtained after an illegal search of his apartment "as they [are] the product of the police's improper entry into the home"). Here, for similar reasons discussed above in finding that suppression of the physical evidence obtained after officers entered Clark's residence was warranted, suppression is also appropriate for the statement that Clark made about having "approximately a quarter ounce of marijuana," as this was obtained after officers followed him inside his residence as a result of the involuntary consent to search. Thus, Clark's statement is "fruit of the poisonous tree" of the involuntary consent and the resulting impermissible search, and will be suppressed. *Johnson*, 2012 WL 5354601 at *9; *Zamichieli*, 2011 WL 6133352 at *3; and

---

(E.D. Pa. Aug. 28, 2007) (finding that while the presence of 23 armed federal agents may function as one indicia of coercion, it "did not convert the interview of [defendant] into a custodial interrogation."). Here, Clark remained unrestrained even after the officers made their observations about Clark's potential marijuana grow operation.

*Chun Yen Chiu*, 857 F. Supp. at 365.

### III.    CONCLUSION

For the reasons discussed above, the Court finds the following: Defendant's initial encounter with law enforcement was consensual; the officers' continued presence on the premises after the compliance check was completed was permissible as it constituted a valid investigatory stop formed on the officers' reasonable suspicion that Clark was operating a marijuana grow operation; Defendant's consent to search, assuming it was provided, was involuntary and warrants suppression of both the physical evidence and the statement obtained as a result of the search; and Defendant was not in custody for purposes of *Miranda* when he made the statement concerning his ownership of the marijuana plants, and therefore suppression is not warranted. Accordingly, the Court will grant in part and deny in part Defendant's Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date: July 30, 2019

_____/s/_____
WILMA A. LEWIS
Chief Judge